UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLES KEMP,

               Plaintiff,                CIVIL ACTION NO. 02-74592

          v.                     DISTRICT JUDGE GERALD E. ROSEN

MARCUS ROBINSON and          MAGISTRATE JUDGE VIRGINIA MORGAN
DAN GIBLER,

               Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court for an evidentiary hearing on damages following the

district judge's entry of a default judgment against defendants Marcus Robinson and Dan Gibler.

Plaintiff is seeking compensatory and punitive damages against Robinson and compensatory

damages only against Gibler.  He alleges that Robinson assaulted him and that Gibler was

deliberately indifferent to his medical needs after the assault.  An evidentiary hearing was held

March 23, 2009, at which plaintiff, his wife, and defendant Gibler testified. Counsel for

defendant Gibler made a motion for directed verdict on damages which the court took under

advisement.

*Background*

This prisoner civil rights action, filed November 19, 2002, was remanded by the Court of

Appeals to the district court in January 2008 for the purpose of allowing plaintiff to file a motion

-1-

for default judgment against two of the five named defendants in the action.  The case arises

from an alleged assault on plaintiff by two prison guards in November 2000.[1]  Plaintiff, through

counsel, brought suit in November 2002.  Plaintiff Kemp was at the time of the assault and when

the complaint was filed a prisoner in the Michigan Department of Corrections (MDOC).[2]  He is

now released.  He sued five defendants under 42 U.S.C. §1983 for an alleged assault by two

prison guards–defendants McClure and Robinson..  Defendant Warden Harold White was

dismissed August 28, 2003.  A Clerk's Entry of Default was entered against each defendant

Robinson and Gibler.[3]  The case proceeded and a final pretrial conference for defendants

McClure (an alleged observer/look out during the assault) and Mars (a nurse who saw plaintiff

afterwards) was held before the district judge in September 2005.  "At this conference, the

parties tentatively agreed to a monetary settlement subject to ironing out a few details concerning

a payment schedule and language for a release of claims. . . . On January 12, 2006, when

contacted by the court, plaintiff's counsel advised that the parties were still working on a

payment schedule but expected resolution shortly.  (D/E 79, pp. 2-3)  When the court had not

---

[1]The district court memorandum opinion (D/E 79) incorrectly identifies the date of the assault as November 23, 2003; in fact, it was November 23, 2000.( D/E #1 Complaint, par. 27)

[2]The pertinent facts and procedural history are summarized in the Memorandum Opinion and Order Denying Gibler's motion to aside the default and Entering Default Judgment against Gibler.  (D/E 79)

[3] As it turned out, Gibler had retired from the MDOC at the time Kemp brought this action.  He forwarded the complaint to the Attorney General's office requesting legal representation.  He believed he was represented as they had represented him before his retirement.  The district court found that this was not sufficient good cause to set aside the default. (D/E 79, p. 5)  Gibler has now hired his own lawyer from his own funds.

heard from counsel by March 16, 2006, it issued an Order of Dismissal indicating that the matter

had been settled among the parties at the final pretrial conference.  Eight days later, plaintiff's

counsel moved to set aside the dismissal, requested a hearing to seek default judgments, and to

put the final settlement on the record.  The court denied the motion to reinstate for the purpose of

seeking default judgments against Robinson and Gibler. Plaintiff appealed to the Sixth Circuit,

which reversed and remanded the case.  In accordance with the remand order, the court

reinstated the case, plaintiff timely filed a motion for default judgments against Robinson and

Gibler.  Robinson did not respond[4] but defendant Gibler filed a cross motion to set aside the

Clerk's Entry of Default.  The district court denied the Motion to set aside the default and

entered default judgments against each defendant.  (D/E 79)  The court ordered that an

evidentiary hearing would be conducted by it to determine the amount of damages (D/E 78, 79),

but subsequently that portion of the case was referred to the undersigned.

*Testimony at Evidentiary Hearing*

An evidentiary hearing was conducted on March 23, 2009 before the magistrate judge.

*Testimony of Plaintiff*

Mr. Kemp testified that the assault occurred on Thanksgiving Day, November 23, 2000.

Things began during the mid- day, between two or four or so in the afternoon in Administrative

Segregation unit where he was housed.  Robinson usually worked that shift and was working that

day.  McClure was the officer in charge of running the showers.  Gibler was not on duty at the

time the assault occurred and did not work that shift at all.  Plaintiff said that he wanted a

---

[4]All mail to him has come back returned and his whereabouts are unknown.

-3-

shower; he began to argue with other inmates and it got loud.  The inmates were teasing plaintiff

because Robinson would not let him take a shower.  About 8:00 p.m., Robinson came to

plaintiff's cell and told him "I will let you take a shower now."  Plaintiff was handcuffed though

the food slot door as is usual and Robinson ordered the door opened.  The handcuffs were of

normal tightness; nothing unusual.  He and Robinson proceeded to the shower area.  The

handcuffs are on a leash.  But when they got to that area, the shower doors were closed and

locked.  Robinson grabbed plaintiff, put his fingers on plaintiff's Adam's apple and put pressure

on it.  Robinson put his fingers in plaintiff's face and eyes.  Plaintiff testified that Robinson then

began to strike plaintiff in the areas of his ribs and thighs.  He administered 50 body blows and

kicked plaintiff in the left ankle.  Plaintiff's right arm was still handcuffed and attached to the

leash.  Robinson pulled the leash through the door and put newspaper over the door window.  He

then continued to beat plaintiff and to grip him on the shoulder.  The beating lasted for about ten

minutes and resulted in injury to plaintiff's right shoulder.  Robinson then returned plaintiff to

his cell.  Plaintiff testified that McClure was the look out.  Plaintiff was aware that Robinson

removed the newspaper from the shower door window before he competed his shift, at

approximately 9:30 p.m.

The shift changed about 10:15 or 10:30 p.m.  When the third shift (night-time) officers

made the rounds, plaintiff could speak only hoarsely.  He asked to see Sgt. Gibler, who had come

on duty with the third shift.  Sgt. Gibler said let's go the nursing station and plaintiff went with

Gibler and two other officers; plaintiff was not handcuffed during this time.  Gibler went inside

the nursing station with plaintiff; the other two officers remained outside.  Plaintiff told Gibler

-4-

that he had been assaulted by Robinson.  Plaintiff described the injury and wanted medical attention right away; plaintiff thought he had a broken right wrist and ribs.  Gibler said that he could see that there were bruises on the ribs and they might be fractured, but asked if plaintiff could make it until the nurse, Kathy Mars, made rounds in the morning.   Exhibits introduced at the hearing show that plaintiff sent a kite with complaints of bruising on 11/23 [leading to the meeting with Gibler], a Health Care request form on 11/24 and an exhibit showing that Gibler took plaintiff's statement.  Plaintiff claims that he was not seen by a doctor until December 5, 2000 and received no pain medication.

Plaintiff does not allege continued voice problems, no claim for left ankle, no claim for rib issues as these resolved a few months later.  Though most of his shoulder problems resolved, he is still having trouble with his shoulder and rotator cuff.  He works carrying trowels and his shoulder bothers him.  He has not received any medical treatment for any of the shoulder problems.

With respect to psychological injuries, plaintiff claims that Gibler scared him because he came to plaintiff's cell a few days later to advise plaintiff that Robinson had been suspended.  He states that he no longer takes a shower with the bathroom door closed or uses a restroom with the door closed because he is afraid of what could happen.

Plaintiff was cross-examined.  He testified when asked about medical care that he did not have insurance.  However, he said that from the settlement that he had obtained from the state on behalf of the other two defendants, he received $35,000.[5]  He did not use this for medical

------

[5]It is not clear if this amount included attorney's fees or not.

treatment.  Plaintiff was incarcerated from 1998 through mid-2006 for false pretenses and retail fraud as he bought a skill saw on his boss's credit card.  He was using crack cocaine at the time but does not do so now.  He lives with his wife.

Plaintiff spent a couple years in Administrative Segregation due to misconduct tickets. Plaintiff stated that nurses were available in Administrative Segregation and he saw nurses twice a day.  Because he is diabetic and was so at the time, he saw the nurse regularly and got morning and evening insulin.  No nurse is on the floor during third shift but the next morning, plaintiff saw Officer Haynes-Love who was on the first shift and the nurse, and he told them both what had happened.  Plaintiff said that three months later he got medication for his shoulder from a doctor.  Gibler told plaintiff that his wrist may be sprained and that Gibler could send plaintiff to the emergency room if plaintiff wanted to go.  Gibler was off the next morning at 6:00 a.m. and plaintiff saw the nurse between five and six a.m.  Gibler did not discuss plaintiff's injuries with him after that first time.  He filed no grievance regarding Gibler's entrance into his cell to tell him Robinson was suspended.  Indeed, he thinks that Gibler is an honest man who tells the truth.

*Testimony of Georgia Kemp*

Plaintiff's wife Georgia Kemp testified that she has been married to plaintiff for 21 years. She works at National City Mortgage and has for about four years.  When plaintiff returned from MDOC, he would often jump up in the middle of the night.  He does not close his doors and his right shoulder continues to bother him.  He uses a heating pad and has problems working.  He is currently on her health plan.

*Testimony of Dan Gibler*

Mr. Gibler was a sergeant with the MDOC.  He retired in June 2001, about seven months after the incident with plaintiff.  He worked the third shift, from 10 p.m. to 6 a.m., and was in the Administrative Segregation unit.  This unit is one which houses inmates who have administrative problems.  They are generally assaultive or are in need of protection from other inmates.  Many of the inmates have difficulty acclimating to the discipline of the prison system and so end up on that Ad Seg unit.  He does not recall why plaintiff Kemp was in the unit.

An employee named Charlie Hunt was working the third floor of Ad Seg.  There is one officer per floor.  Mr. Kemp was quite agitated and upset when Mr. Gibler came on for duty. Gibler took him to the nursing station for plaintiff's protection so that they could talk privately. There is no nurse on at night (on the midnight shift) so he knew it would be private.  Mr. Gibler testified that he and Mr. Kemp sat and talked in the nursing station.  Kemp reported a variety of injuries.  Gibler had Kemp strip down to his underwear so that he could assess any injuries.  Mr. Gibler saw no blood or obvious broken bones.  He did not see redness or bruising at that time. After the physical assessment, Mr. Gibler wanted to get Mr. Kemp to calm down.  Mr. Gibler asked plaintiff if plaintiff wanted to go to the hospital.  Duane Waters Hospital was only about 1500 yards away. Mr. Kemp declined but stated "No thanks.  But thanks for getting me out of there and talking to me."  Mr. Gibler then took plaintiff back to his cell.  Plaintiff was diabetic and food service would leave out bread, peanut butter and jelly and glucose tubes for each floor. Mr. Kemp was quiet the rest of the night.  Mr. Gibler was not there the next morning when the nurse came on.  There was some conversation between Mr. Kemp and Mr. Gibler regarding Mr. Robinson's opinion that Mr. Kemp was "a pain in the a—s" and needed to be taken care of.  Mr.

Gibler would not have written up a report about their conversation.  Mr. Gibler had no authority

to remove Kemp from Ad Seg.  Mr. Gibler denied ever coming into Kemp's cell and would not

have told him the Robinson was suspended.  Mr. Gibler denied ever having heard about any

potential beating by Robinson.  Gibler was pretty quiet and kept to himself.  The only other time

Gibler had been in Kemp's cell was one time he was having a diabetic episode.  Mr. Gibler never

had any problems with Mr. Kemp.  There are about 175 to 200 prisoners in the unit on any night.

There may be one to four demands for medical care per night.  With respect to plaintiff's

allegations regarding Robinson, Mr. Gibler reported it to the day shift supervisor before he left

that morning.  He gave a verbal report and then also reported it to the afternoon shift supervisor

when he came on the next day.  He told Mr. Kemp that he would report the allegations and

incident and he is a man of his word.

*Determination of Damages*

    *Damages Against Mr. Gibler*

       This cause of action is one essentially for a constitutional tort.  Analysis therefore turns

on both liability and damages.  It is settled law in such analysis that there must be a duty, a

breach of that duty, and the breach must be the proximate cause of plaintiff's damages.  Here,

plaintiff alleges that defendant had the duty not be deliberately indifferent to his rights under the

Eighth Amendment.  In the complaint, he claimed that defendant breached that duty and plaintiff

suffered damages.  Plaintiff does not seek punitive damages against Sgt. Gibler, but limits his

claim to compensatory damages.

-8-

The court has carefully considered the allegations against Mr. Gibler and finds that Gibler is not liable for any of the damages.  Although default judgment has been entered by the court against Gibler, and therefore the court is precluded from considering whether Gibler breached his duty,[6] it is clear on the record before the magistrate judge that plaintiff has not established any link between his damages and the actions of Gibler.  Thus, he has not established proximate cause.

Deliberate indifference has been defined by the Supreme Court in <u>Farmer v. Brennan</u>, 114 S.Ct. 1970, (1994).  The Court held that a prison official may be liable under the Eighth Amendment for denying an inmate humane conditions of confinement only if "he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  <u>Id.</u> 114 S.Ct. at 1979.  A constitutional violation occurs only where the deprivation alleged is objectively sufficiently serious to inmate health or safety, and the official was subjectively aware of the risk.  The subjective component of the deliberate indifference standard does not permit liability to be premised on obviousness or constructive notice.  There must be subjective recklessness, as that term is used in the criminal law.  An official must consciously disregard a substantial risk of serious harm, that is, he must know that inmates face a substantial risk of serious harm and disregard that risk by failing to take

---

[6]Had Gibler been given the opportunity to set aside the Clerk's Entry of Default, it would have been clear that he had a meritorious defense in that none of his actions showed deliberate indifference to Mr. Kemp's circumstances either before or after the assault by Robinson.

-9-

reasonable measures to abate it, in order to be liable for deliberate indifference under the Eighth Amendment. Id. at 1979. None of this is shown here but a default judgment has been entered.

With respect to proximate cause, plaintiff was assaulted on the second shift by Robinson, while McClure acted as the look out. Gibler does not work that shift. He does not supervise or interact with either of those officers. At most, he sees them in the context of changing shifts. It was clear that Robinson and Gibler do not socialize and there was no evidence of conspiracy. Gibler kept to himself. While at most Robinson may have complained on one occasion about Kemp being a pain in the a-s, that is not enough to show that Gibler's actions proximately caused the assault. When Gibler came to work on the third shift, he took prompt and appropriate actions when Kemp brought the beating to his attention. He gave plaintiff a private space to convey his concerns, offered to take him to the hospital which plaintiff declined, did a visual assessment of his wounds, and advised him to bring it to the attention of the nurse on rounds the next morning since he knew that plaintiff would see the nurse due to his diabetic status. Gibler had no involvement in the medical care or decision-making.  In addition, Gibler immediately reported the situation to the next shift commander and checked again to make sure the incident had been reported when he came on for duty the next day. The fact that these were verbal reports suggests only that he felt it was better for plaintiff and would be equally effective in discipline of Robinson. He neither disregarded a risk of which he knew nor was he deliberately indifferent to the known serious medical needs of plaintiff.

Plaintiff claims psychological injury in that Gibler and two others came into his cell to tell him that Robinson was suspended. and this scared him. The court does not find plaintiff

-10-

credible in this regard and finds that Gibler did not come into plaintiff's cell following this incident. Gibler did admit a one time entry into plaintiff's cell when he was in diabetic distress, prior to the assault; plaintiff may have confused that incident with something else. Both Gibler and plaintiff testified they had no prior animus with one another and plaintiff testified that Gibler is an honest man who would tell the truth. Plaintiff would have been aware of Robinson's suspension without Gibler's involvement and his claims of continuing psychological distress seem to result as much from the general circumstances of a lengthy period of incarceration as opposed to this particular incident.

In addition, Gibler was entitled to representation by the Attorney General who for whatever reason failed to under take the same. The AG settled the case with plaintiff for the approximate sum of $35,000. To the extent that Gibler would have been represented by them, any damages which could have been attributable to him would have been subsumed in that settlement. But, more importantly, none of the damages result from any action by Gibler. Neither the injuries, the pain and suffering, nor the ongoing psychological allegations are shown to be proximately caused by his actions. Thus, Gibler is liable for zero damages.

*Damages Against Defendant Robinson*

The testimony shows that Robinson deliberately beat plaintiff for the purpose of punishment. The beating lasted about ten minutes, resulted in pain and suffering, no broken bones, and an injured shoulder. Plaintiff settled his case against the other involved officer for $30,000 (and $5,000) for the nurse. After careful consideration, the court determines that a

-11-

slightly larger amount of compensatory damages are appropriate against Robinson and so recommends an award of $30,000 in compensatory damages against Robinson only.

Plaintiff also seeks punitive damages. Robinson lost his job, apparently as a result of this incident and his current employment and financial situation are unknown. The court determines that an additional $10,000 in punitive damages would be appropriate, and that a reasonable attorney fee award, considering the appeal and evidentiary hearing, would be $20,000 for a total award against Robinson only of $60,000 ($40,000 to plaintiff; $20,000 to the attorney) and so recommends that amount.

*Discussion*

Damage awards for prison assaults are quite variable. The court in *Blissett v. Coughlin* 66 F.3d 531, 533 -535 (2nd Cir. 1995), a case decided prior to the Prison Litigation Reform Act, the Second Circuit upheld a jury awarded $75,000 against a number of New York State Department of Correctional Services (DOCS) officials and employees, for a variety of constitutional claims arising from an alleged assault perpetrated upon Blissett by several Attica prison guards, and his subsequent confinement to a Special Housing Unit (SHU) cell. The case is 14 years old but the circumstances are worse than alleged by plaintiff here. The only witness Blissett presented at trial was himself. Blissett's testimony was substantially as follows:

> On June 28, 1983, Blissett was subjected to a routine random contraband search while proceeding with other inmates to the recreation yard following dinner. During this search, Officer Clark accused Blissett of dropping a steel "shank," a homemade knife, in an effort to avoid its detection. Officer Clark, Officer Squires and Sergeant David Smith then escorted Blissett to a room beyond the view of the other inmates. There, following a strip search, Sergeant

-12-

Smith struck Blissett and accused him of planning to stab a corrections officer. These guards then handcuffed Blissett's hands behind him, so tightly as to cut off the blood circulation to his hands. Sergeant Smith continued to slap and punch Blissett. Officer Clark used his baton to strike Blissett on the head and spear him in the back. Officer Clark placed the baton through the handcuffs and between Blissett's legs, pressing the baton downwards against the handcuffs and prying upwards against Blissett's groin.  Sergeant Smith, Officer Clark, and an unidentified officer then escorted Blissett to the SHU cell area, striking and kicking him along the way. There, Blissett was turned over to Sergeant Bowen and Officers Offhaus, Helak, and Barry Watson. Blissett was assaulted a second time by these officers as well as Officer Clark and the unidentified officer. During this assault, Blissett fell to the floor, still handcuffed, where several officers kicked him. Sergeant Bowen and Officer Watson lifted Blissett from the floor and pressed his face against a wall, again accusing Blissett of planning to stab a corrections officer.  Blissett was strip searched a second time after which he remained naked and handcuffed. After this search, Sergeant Bowen grasped Blissett's throat, squeezing it while threatening to kill Blissett if he attempted to report the assaults. Blissett testified that he was unable to breathe during these threats and subsequently fell unconscious. After Blissett regained consciousness the assault ceased.

Blissett was escorted handcuffed, naked, and bleeding from the mouth, to an SHU cell designed to house inmates who were considered suicide threats. These "mental observation" cells have no movable furnishings, no interior source of illumination, and thick plexiglass covering the bars, thus limiting air circulation. Blissett testified that, at the time he was placed in this cell, the walls, mattress, sink, and floor were smeared with feces. Later that evening Blissett was issued a shirt, shorts, underwear, and sheets, all of which also smelled of feces. Blissett testified that he remained in this cell for eight days, at which time he was transferred to a conventional SHU disciplinary cell.  According to Blissett's testimony, he was seen by a nurse from the prison infirmary as he was being escorted to the SHU cell. Sergeant Bowen intervened in their conversation and the nurse departed. Blissett repeatedly requested medical attention during the night,

-13-

but no medical personnel visited him until the following day.
Blissett testified that he was visited by Defendants Downs and
McGee on several occasions thereafter, but that they were entirely
unresponsive to his complaints. All of the defendants testified in
their own defense. They unanimously maintained that they did not
witness, nor were they aware of, any of the constitutional
violations alleged by Blissett, much less any assault or altercation.
Defendants moved for judgment as a matter of law on all counts
and for all defendants at the close of both Blissett's case-in-chief
and the close of all evidence. The district court granted the motion
with respect to Defendants Bates, Cochrane, and Harold Smith on
all counts; and to Sergeant Smith, Officer Clark and Officer
Squires with regard to the conditions of confinement claim. The
court denied the motion as to all other claims and defendants.

Neither party raised any objections to the jury instructions which used special
interrogatories.  With regard to Blissett's unnecessary force claim (Count I), the jury returned a
verdict against Sergeants Bowen and Smith and Officer Clark, and in favor of Officers Helak,
Squires, and Offhaus. The jury awarded $75,000 in compensatory damages and punitive
damages of $5,000 against Sergeant Bowen, and $10,000 each against the other five defendants,
including Helak, Squires, and Offhaus against whom the jury had found no underlying liability.
The punitive damages against the latter three were subsequently dismissed by stipulation of the
parties.

As to Count II, concerning the conditions of confinement in the SHU cell, the jury found
against Sergeant Bowen and Officers Helak and Offhaus, the only remaining defendants on
Count II.  The jury did not award Blissett any compensatory damages; however, it awarded
punitive damages of $10,000 against Sergeant Bowen, and $5,000 each against Officers Helak

-14-

and Offhaus.  The jury found for both defendants on Count III, the deliberate indifference to

serious medical needs claim

In this circuit, awards have often been considerably smaller, even in pre-PLRA cases.[7]

His claim is that Robinson and McClure alone acted to beat him as a particular result of their

animous against him.  In the Sixth Circuit case of *McHenry v. Chadwick* 896 F.2d 184, 185 -186

(6th Cir. 1990), the plaintiff-appellee E. Scott McHenry alleged a deprivation of his

constitutional rights while a prisoner at Brushy Mountain Penitentiary in Petros, Tennessee.

Specifically, McHenry claimed he was twice assaulted by correctional officers in violation of his

rights under the Eighth and Fourteenth Amendments to the United States Constitution.  The jury

awarded him $150.00 in compensatory damages and $2,600.00 in punitive damages.  The district

judge also awarded McHenry reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

The <u>defendants</u> appealed the denial of their motion for judgment notwithstanding the verdict, or

alternatively, for a new trial.  The Sixth Circuit affirmed.

In *Wolff v. Moore* 199 F.3d 324, 327 (6th Cir. 1999)[8], it was undisputed that inmate

Wolff was physically assaulted in his cell by Officer Moore on the night of October 15, 1995,

having been beaten about the face and suffering a broken nose.  At trial, Officer Moore admitted

to beating Wolff, as well as testified that Officer Whitlow had aided in the planning and

commission of the assault. Whitlow denied any involvement in or knowledge of the beating.

---

[7] It should be noted that this is not a class action and plaintiff does not allege any
overarching, systemic conspiracy by MDOC officials.

[8] Reversed for lack of exhaustion under the PLRA, see *Thomas v. Woolum* 337 F.3d 720,
734 (6th Cir.  2003).

Both former Officer Moore and Officer Whitlow contended, however, that Wolff's Eighth

Amendment claims against them involve "prison conditions," within the meaning of the Reform

Act, and that Wolff was not only required to exhaust his administrative remedies prior to

bringing his § 1983 claim, but that he failed to do so.  Officer Whitlow further argues that the

magistrate judge erred when he admitted testimony that a witness for the plaintiff had agreed to

severally liable in the amount of $8,250.00 in compensatory damages, that Moore was

individually liable in the amount of $45,000.00 punitive damages, and that Whitlow was

individually liable in the amount of $30,000 punitive damages.

*Conclusion*

Accordingly it is recommended that an award of damages against each defendant be

entered as follows:

Defendant Gibler: No damages, no attorney fees

Defendant Robinson: $60,000 [$30,000 in Compensatory Damages; $10,000 in punitive

damages; $20,000 attorney fee.]

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within ten (10) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140

(1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v.

Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues,

but fail to raise others with specificity, will not preserve all the objections a party might have to

-16-

this Report and Recommendation.  <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir.

1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

magistrate judge.

　　　　Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


　　　　　　　　　　　　　　<u>S/Virginia M. Morgan                              </u>
　　　　　　　　　　　　　　Virginia M. Morgan
　　　　　　　　　　　　　　United States Magistrate Judge


Dated: July 14, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon parties via the Court's ECF
System and/or U. S. Mail on July 14, 2009.

　　　　　　　　　　　　　　<u>s/Jane Johnson</u>
　　　　　　　　　　　　　　Case Manager to
　　　　　　　　　　　　　　Magistrate Judge Virginia M. Morgan